May it please the Court, in this narrow appeal, the District Court violated the Prison Litigation Reform Act and did not give the proper deference to the professional and clinical judgment of the Department of Mental Health. You do understand we're going to consider both mootness and the merits of this hearing? That's correct, Your Honor. Would you like me to address mootness first? No, no. It's up to you. You may not think it needs any addressing or whatever. It's up to you. I just want you to understand that both issues are before us. Okay. Thank you, Your Honor. Well, I'll address the merits first and then I'll briefly discuss the mootness issue. This appeal concerns the District Court's order to double the rate of admissions from five to ten inmate patients per week into two inpatient units operated by the Department of Mental Health at Salinas Valley State Prison. If the District Court had instead followed the undisputed evidence that was presented by the Department of Mental Health at the evidence you're hearing, in other words, if the District Court had just left the admissions rate at five per week, the inmate patients in those units would be better off today. With less involvement by the District Court and more deference to the clinical judgment of the professionals, clinicians, and administrators at the Department of Mental Health, the same full treatment and programming could have been achieved and faster. So because the District Court failed to follow the Prison Litigation Reform Act's requirements, defendants asked this Court to reverse the District Court's order. The relief order by the District Court violates the Prison Litigation Reform Act because the Prison Litigation Reform Act requires that relief be narrowly drawn, extend no further than necessary, and be the least intrusive means of correcting the violation of the federal right. The goal here was to get these inmate patients off the wait list into inpatient care faster. Since the admissions were rushed, moved from five to ten inmates per week, it actually takes longer to get them up to full treatment because then the clinicians have to catch up. So now it's actually going to be July before full treatment and programming will be achieved in these two units, whereas it would have been right about now, about mid-April. So is it the State's position that no treatment is better than fast treatment? No, it's not, Your Honor. There are always going to be admissions to these two units. It was going to be at five per week. And so at five per week, that was the rate that the clinicians determined we can not only provide all the assessments that need to be done as part of the admissions process, but we can provide treatment to those inmate patients once they are already admitted. At ten per week, all they can provide is the admissions process and those assessments. So once the patients are admitted into the unit, they can't provide the treatment and programming, and so the inmate patients end up spending a lot of time in their cell. Wouldn't you say the judge had to accept the views of the clinicians there, the experts? How long has this judge been handling this case? He's been handling the case since the early 1990s. Well, after 20 years, don't you think he has pretty good knowledge of the record and the facts and the ability to make this kind of judgment? He's heard a lot of testimony from the State, some of which he has rejected. But it's not as if you've suddenly got a district judge coming in and having two parties who've been battling with something for years and he doesn't listen to their experts. By now, he must be pretty much of an expert himself in this case. Well, Your Honor, the prison litigation reform act requires that you look at the current conditions, and that includes the conditions at this facility, which is a specific kind of inpatient treatment unit. At this particular prison, it's only two units with 58 beds each. It's only 116 beds. And based on the clinicians looking at what their treatment resources that were available were, based on the size, the space, the physical point limitations, the staffing, they said, we can get everybody in here if we do it at five per week, and that will also allow us to treat those inmate patients once they come in. At 10 a week, which was not supported by any evidence other than the fact that it was faster, at 10 a week they said, well, we're not going to be able to provide treatment to these guys once they get in, and as a result they're going to end up spending a lot of time in their cells, which puts them at risk of decompensating. It makes it into a potentially dangerous situation. Whereas when they were in enhanced outpatient treatment on the wait list, they were getting 10 hours a week of therapeutic programming, as well as regular contacts with their primary clinicians. So the problem is you have this period after admissions start where the treatment actually dips, and it gets worse than it was for this period of time. They're spending it in their cells while all the staff in the treatment space is consumed with the admissions process. And so if the district court had stayed out of it with less involvement, then they could have not only treated those inmates when they got in there but done the admissions process. It would still be full right now as we stand here today because it would have been full by early April, and there wouldn't be this lag time. Right now we're looking at July before they can be up to full treatment and programming because they have to catch up. Is it correct that as of July 2010 there were some 480 inmates on the wait list waiting for high custody intermediate outpatient beds? That may be correct, Your Honor, as far as July 2010. That's not the current wait list today. The wait list last fall- You're talking about the time the judge, Carlton, entered the order. That's right. It was over 480. And it is correct, isn't it, that two of those men committed suicide? That is correct, Your Honor. And the defendants regret any suicides. But the issue in this case is the remedy doesn't address that problem. It doesn't improve the treatment for those individuals coming off the wait list. That's the problem with it. By rushing it at 10 a week, it gets them into a place where their treatment actually decreases because once they come in, they can't get the treatment because the staff in the treatment space is consumed with the admissions process. And so if there had been more deference and less involvement by the district court and just left it at 5 a week, there still would have been admissions starting on July 15th. And that admissions process would have gone forward at 5 a week, and then they would be complete around roughly April 8th, which was last week, in accordance with what the clinicians determined that they could best do with their resources. So as a result of the order, there are inmates who are in the treatment facility but not enough clinical personnel to provide treatment? And it's also a space limitation. There's a physical plant limitation as well. So there was a period in the beginning of the admissions process in January and February where inmate patients would get admitted and then not be able to get any treatment once they got admitted because all the treatment space and staff was occupied with the admissions process. And the state's position is that a situation where they're outside treatment and wait-listed, which in some instances has produced suicides, that that's better than what was ordered? The reason that treatment is better is because when they are on that, they're at the enhanced outpatient level of care, which is the second overall level. There are five levels of mental health care for California state prisoners. The first three are provided by the Department of Corrections. The second level is that enhanced outpatient level of care where the first two phases were filled, these 116 beds. When they're there, not only do they have their 10 hours a week of therapeutic programming and access to their primary clinicians and treatment teams, they also have access to the mental health crisis beds, which is the third level, and that's what's provided in Department of Corrections. So if they have a situation like that, they can get those crisis beds. The wait list is also prioritized so that it's prioritized by level of acuity and by the treatment options that are available at the institution where the inmate is and if there is a change in conditions so that the primary clinician or member of the treatment team or one of these individuals on that wait list says, this guy needs to get to inpatient care now, with a short two- to three-paragraph memo, that inpatient can move to the top of the list, which puts them in the next available bed. So they are being treated when they're on that wait list. It is not no treat. And I take it at the hearing leading to this order that the state put on expert testimony, which basically said we can't comply with this order and provide adequate therapeutic care for these inmates? That's right. That was the testimony of Victor Brewer, who is the administrator, and he talked about the admissions process, the strain on the physical plant, the need to get all these guys assessed and treated, and the fact that they would spend a lot of time in their cells. There was nothing at the hearing that said 10 a week was a clinically appropriate rate. The evidence at the hearing supported a five-a-week rate. I'd like to speak to mootness briefly before I save the rest of my time. Defendants believe this case is not moot because it falls into the exception for cases that are capable of repetition yet evading review. By its very nature, this order that was issued by the district court had to be complied with in a matter of weeks, and now it's been four months since October, and it's all been complied with. That's not enough time for full appellate review, which could be 12 months or 18 months or even longer. This court and the Supreme Court have said that's not enough time for appellate review. Plus, it's capable of repetition because there's another one of these facilities set to open later this year. In that facility, which is a different facility, but there the clinicians have said the appropriate rate of admissions is six per week. However, the plaintiffs have made another request to double that rate to 12 per week. Is that facility coming online in the Eastern District? It's going to be in Vacaville, which I believe is Solano County, so I believe that is the Eastern District of California. Okay. And I'd like to reserve the balance of my time if there are no further questions. Thank you. Thank you. Ernest Galvan for the Coleman Plaintiff Clause. May it please the Court. I'd like to address mootness first. My friend from the States said it very well. This is about a very specific facility, the C-5 and C-6 conversions of a regular prison housing unit to a makeshift temporary inpatient hospital. It's a very unique situation. It's not one that anyone would try if there weren't an emergency. Why is it unique? I mean, why is the issue of what evidence the District Court needs in order to increase the rate over what the State believes, why is that issue unique? It is unique in comparison to the comparator that the State is offering. The State has said, well, this is going to be repeated because of the opening in October of a 64-bed unit at Vacaville. The 64-bed unit at Vacaville is clear in the record that we have put in in our motion to dismiss. It's a completely different type of project. That is an actual standalone inpatient hospital unit on the footprint of a prison ground. It's not a makeshift emergency conversion. Well, it all depends on what you think the issue is. If you think the issue is what number do you need for a makeshift facility, then it may be moot. If the issue is how does a court determine what the number should be, on what basis may it determine it, then it's clearly not moot. Well, the review of what basis it should be determined would be done under the clear error standard from a factual record, and that will be a completely different factual record for a standalone hospital unit than for a makeshift prison conversion. That's why we have a doctrine against advisory opinions. Well, maybe before we decide it, we should know exactly what the issue is. Is counsel correct that the only evidence as to what the rate of admission should be was provided by the state? No, Your Honor. Counsel's argument goes far beyond what was in the evidentiary record in a number of ways, and particularly in that regard. Judge Carlton had before him the performance under the very same order he was enforcing here. What we're dealing with here is an order enforcing a prior order. The prior order can be found in Supplemental Excerpt of Record 299. It's an order from June 18, 2009. And that order did two things. It approved the state's plan to activate this emergency conversion, C-5, C-6, in one year, 12 months. It also ordered the state to admit to a unit at Atascadero State Hospital for the same type of care, inpatient care, 10 prisoners per week as opposed to five. And the court had a series of status conferences about how this was progressing. And the state's counsel submitted a declaration saying, in fact, yes, we are admitting 10 per week. It's going well. In fact, some weeks we're doing 13. Counsel for the state stood up, and it's also in the Excerpts of Record, Supplemental Excerpts of Record, and reported to the court, yes, 10 per week is going fine. In fact, some weeks we're doing 13 and 14. And so Judge Carlton had direct experience with a similar kind of order to deal with this emergency. So that was in front of Judge Carlton. And also the issue here is not Judge Carlton putting himself in the position of having to decide what is the good rate for admissions to a unit. The issue is that the state had already missed a deadline to comply with this emergency. They were under an order to open this unit in June 2010. And then as the summer of 2010 progressed, they arrogated to themselves all sorts of extensions. We're having this particular problem. Court, we are not going to open it. Did they ask for leave from the court to miss the deadline? No, they didn't. They simply said we're missing the deadline. Is that before us? Well, it's before the court in terms of what of reviewing what Judge Carlton did. What Judge Carlton had to do was determine what's the remedy for violation of his prior order. And he had notified the state that these timelines are very serious. These 400 men are suffering permanent harm. Even if they don't commit suicide, to be kept out of a hospital causes permanent harm. You may not get back to the baseline you were at by the time you survive being kept out of a hospital. Counsel, I have an interjected question. Go ahead, Judge Gould. Are you suggesting that the order before us is a form of a sanction? No, Your Honor, I'm not suggesting. I don't really get that. I don't get that under the PLRA. I don't see how that could be correct. Your Honor, I see how it could enter an order saying do this or that with the prison as a sanction for the state not meeting deadlines. We briefed the developments under the PLRA that are exemplified by the Jones L case out of the Seventh Circuit regarding heat problems in a supermax area. And it's a developing area of the law as to what is the PLRA status of an order that's not initial prospective relief. It's simply dealing with the failure to comply with prior prospective relief. It's an enforcement order. And the Seventh Circuit has held that that does not require PLRA findings in needs narrowness.  Now, the Ninth Circuit has not directly addressed this, although in Hallett v. Morgan it recognized the difference. Now, it's an interesting legal question, which at some point there may be a non-moot case that arises that will be appropriate for resolving it. But I think this is yet another reason why this case should be decided on mootness grounds, is that it's not the proper vehicle without any record that's with a current controversy. It's not the proper vehicle to decide that. It's an important question. It's a difficult question. And it should wait for a non-moot case. The other reason this is not a proper vehicle is that the arguments that are being made, the factual contentions that are being made here on appeal, were simply not raised below. And I refer the Court to the entire transcript. It's at ER 40 to about ER 140. There's no witness in the evidentiary hearing below who said that the patients are better off in the prison system instead of in the inpatient housing unit. That's a factual contention entirely made up in appellate briefs. There was no witness who could say that to Judge Carlton because it's simply not true. Well, let's talk about what was before Judge Carlton. Your opponent suggests that the only medical, clinical evidence before him was that doubling the rate of intake would not only not help, it would hurt. Is that correct? That is completely incorrect, Your Honor. There was no such testimony before him. The testimony before him was very clear, and it's very clearly laid out when the Court takes over the cross-examination of Victor Brewer on pages ER 94 to ER 96. And the Court directly gets into this question. And he asks, Victor Brewer is not a clinician. He's the official who is in charge of this unit, been in charge of this unit for many years. He's an administrator? He was an administrator for the Department of Mental Health. The State did not bring any clinical experts to talk about this. They simply brought an administrator. But he was an administrator well known to the Court because the Court had seen Victor Brewer before activating another unit at the same prison. And the Court asks Mr. Brewer on page 95, saying, well, you have an emergency here. Now, this is one of these things. I have these four. Oh, Your Honor, I have the State's. Which excerpt is it? It's the State's volume two of their excerpts. And it is page 94. So it's the volume two of the State's. Let me find it. I think, what's the ER number? The ER number is 94. Well, that's where I was. It was in volume one. That's where ER 94 appears. If I may, I can simply provide my own copy to the Court. This is not it. No, Your Honor, I don't believe we submitted any manuscripts either side. That might be a different matter. Okay, give me yours. Okay. At 94, down at the bottom, starting at line 24. You were going to let me look at yours. Oh, I'm sorry. Let me just see which one this is. Okay, I've got it. And you thought you would start at the bottom? If we start at the bottom there, and I'll have to paraphrase because I don't have it in front of me, Your Honor, but the judge takes Mr. Brewer to this question. I have this terrible emergency situation, and you're telling me that certain intake standards, your initial treatment interviews and such might be delayed, but meanwhile I have all these people not getting care. And then he asks him directly, toward the middle of the next page, on page 95, why would you choose the first thing, to prioritize the first thing, getting all your interviews done on time and all, rather than the second thing, getting people into care? And Mr. Brewer, he doesn't say, he has every opportunity to say, well, it's clinically necessary, or care will fall below the Eighth Amendment minima. All he says is, I'm mandated by state regulations to do that. But if those regulations were waived, as I have in the past, This is where he talks about licensure requirements? Correct, Your Honor. And the judge follows up with that on page 96 and says, asks Victor Brewer directly, is it better or worse? This is around the middle of page 96. He brings Mr. Brewer back to the stand, and he asks him, is it better or worse? And Mr. Brewer, the only Department of Mental Health witness present, says, it is a balance, sir. It is a balance. Meaning, I don't have any testimony to offer you, Your Honor, to show that this would hurt the patients or that this would cause care to fall below a humane minima. Thank you, counsel. There was also no testimony at the hearing regarding the kinds of care that the 400 men on the waiting list were receiving. There was no testimony to say that either they were getting the 10 hours that they were supposed to get under the written policies, the 10 hours a week, or that even if they were getting it and more, that it made up for the lack of hospital care. And it's important to remember that the reason these men are on the 400-person list is that a doctor, not our doctor, CDCR's doctor, said where they are now, even though they're in the enhanced outpatient unit, they are sick. They are too sick for that place. They need to be in the hospital. It's just as if your doctor in his office saw you one day and said, this is too much. You have appendicitis. I don't have anything here to take care of you. I'm calling the ambulance. It would be no answer to say, well, you're in a doctor's office and there's a nurse there and there's Band-Aids and there's everything, when the doctor says you need to be in the hospital. You need to be in the hospital. And the record in this case, going back to 1993, and I'll refer the court to footnote 49 of the first published decision in this case, which is 912F1282, documents that the record before this court was that when seriously mentally ill inmates do not receive their needed treatment, they can worsen severely, losing most or all of their ability to function. It's like being a heart patient who doesn't get care in the beginning of a heart attack. You might survive, but how much heart muscle will you have left after you survive, compared to if you had the care before? Mental health is the same way. They may be able to get you back to the baseline after eight months on this waiting list, but it's not going to be the same baseline that you would have gotten to if you had gotten care. It's a very serious emergency. And the evidence before Judge Carleton was, on one side, that emergency. On the other side, the most that the DMH people would say was that intakes would be slowed down. It would take a long time to catch up. And as counsel said here, it would take a long time to get, and he used the words many times, full treatment. Well, this is an Eighth Amendment case. This is not about full treatment. This is about minimally humane treatment. That's what Judge Carleton had to protect. And that's why if it's not considered moot, it should be affirmed. Thank you, Your Honor. Your Honors, I'd like to address a couple of the points that Mr. Galpin made in his statement, and I'd like to also direct the Court to a couple of points in the record that I think might clear up some confusion. You usually have about 10 seconds, so I'll take a little bit of your rebuttal time to ask you this question because it's important to me as one of the judges on the panel. What evidence was there before Judge Carleton that doubling the intake would be harmful? I'll direct the Court to page 75 of our Volume II of the excerpts. This is the testimony of Mr. Brewer, and the question was – Who's the doctor? Right, but he's the administrator in charge of taking into account all of this, all of the clinicians that work there in deciding how this needs to be run. We also did present the declaration of Dr. LaPone, who's a psychiatrist, after the hearing as part of our motion for reconsideration. But I'll read this question and answer on page 75 of our Volume II excerpts because I think it's very relevant. The question was, if DMH were to increase admissions beyond five per week, would the patient still receive the programming and yard time that DMH typically provides as part of its programming? Answer, no, because for each assessment, there's five different professional classifications, which we do an assessment, so there's five hours plus one hour for the IDTT, which is, I can tell, the Interdisciplinary Treatment Team. So we would consume the vast majority of the time of our clinical staff in doing preparation, evaluations, testing, and IDTTs. I'd also direct the court to page 88 of our excerpts, which is still Volume II, and this is near the end of Mr. Brewer's testimony, and he's the witness there on line 20, and he says, it is my understanding that they are getting a maximum of 10 hours per week in the EOP, which is the Enhanced Outpatient Program. So that's testimony there that indicates not only are they getting treatment where they are, but the treatment will decline when it's increased. I'd also like to point the court to evidence that was presented in the testimony of Jean Barrowhead, who is a Deputy Administrator for the Department of Mental Health, and she was asked... Is this during the same hearing? Yes, during the same hearing. She was asked about Atascadero State Hospital, where they did an admissions rate of 10 per week. Atascadero State Hospital is a very different facility than C5 and C6 units here at the Salinas Valley Psychiatric Program. It's a state hospital. It's much bigger. It deals with lower custody inmates. They have much more resources available to provide assessments and treatment to the patients that are coming in. It's a different situation. As she said, it's like comparing apples and oranges. This is on page 100 of our excerpt of record. Going back to the mootness issue that I know was raised earlier and the issue. The issue is the same at this next facility because the issue is the deference to the clinical judgment. These clinicians say six a week, that's what we can do. The district court needs to give deference to that. What clinician testified? There was the testimony provided. Well, there was Mr. Brewer, who's an administrator, and he's basing that on... What he understands. What he understands from the nurses and the social workers and the psychologists and the psychiatrists that work at the facility. There was also the testimony of Dr. LaPon that was presented by declaration, and that's in our excerpt. And that's in the motion for reconsideration. Right. That was in the motion for reconsideration, and that's in our excerpt at page 35. He is a psychiatrist. And I'd also like to point out that this order put a new obligation. Oh, I see my light is on. I have a couple other things to address. There was a new obligation here. The prior order that had been approved was always at five per week. This order raised it to ten per week, which put a whole new set of obligations on to the Department of Mental Health. And I believe that was my last point. If there are no further questions. Thank you, Kevin. Thank you. Thank you both very much. The case to serve here will be submitted. Any news on... His office is on 18th and 13th. Tell him to turn it on twice. Steve? I have a couple of questions for the lawyer for James. Which one? Is that the one that's with you? Yeah. I'll wait till the other time. Yeah, Judge Reinhardt. Yes. Judge Reinhardt. Yes, what I wondered is if the counsel is not here, and he had a problem at the airport. Yeah. I wonder if we should consider just recessing and coming back on when he gets here. At least from one of the other cases I did this last year, Abu Fayyad. It makes me concerned that if they've stopped a lawyer at the airport, then if they're searching his computer or something, they could go on for a long time. Which lawyer has stopped? Whitney? No, no, I mean from which party? It's for the city of Davis? No, I'm here for the city. Okay. Well, Judge Gould, Judge Gould, can you hear me? Yeah, I can hear you. You know, I don't know. Yeah, who is the lawyer who has stopped? The lawyer for Bouzayan, who is the appellee. The appellee. Right. Well, you know, from this other case where I wrote an opinion, you know, it just leads me to be concerned that if they've focused on the lawyer, they could have some extensive procedure. So we really can't assume that. My question is this. Could we do this case tomorrow? How are you doing? Well, I'm from Sacramento. Yes, do you like Los Angeles? You're a lawyer for the city of Davis? Yes. I'm sure the city would be happy to have you here for another day. Yeah, I have some things that I have to take care of first at home. You know, I certainly don't want any unfair advantage. As the appellant, I'd be willing to submit it on the briefs. Well, I think you have a question. Do you want to submit it on the briefs or would you rather have it come back tomorrow? Judge Gould, what's your position on submission? Well, I have a position on the case provisionally. I would have rather heard argument, but I'm willing to submit it on the briefs. We're going to be here, I think, all of us for the rest of the week. Right. I have no problem with hearing it some other day this week. Wednesday and Thursday. I just don't want to screw up the city of Davis, counsel. Would it be possible to appear at my telephone conference, Your Honor? I know some of the health courts actually encourage telephonic arguments. Well, we don't encourage it in Canada, but we can do it. Given the extraordinary situation, it would be easier, I think, for me to shovel back and forth. Oh, well, it's only Sacramento, right? Oh, that's true. I can do it. You can do it Wednesday or Tuesday, right? Sure. I can return and then come back. Some people go to Sacramento and back every day and they're in the legislature. They do. So, Steve, Steve. Yes. Yeah. Maybe before deciding if you do it later in the week, we should just recess for an hour and see if see if the lawyer shows up or if the clerk can find out what the timing is. All right. Why don't we do that? We'll go in for an hour and then we'll determine at the end of the hour. You don't mind sticking around for an hour? No, I'm fine for the near future. I have a flight to catch until four. All right. Well, then we'll come back in an hour and see how we proceed from here. Do you know the lawyer on the other side? Certainly we've met, but I have not spoken to him recently. Okay. That's what I was going to ask. Okay. All right. We'll recess for an hour. There's a nice attorney's lounge right down the hall. Thank you, Your Honor. As long as you don't get too hungry. That's it. That's Steve. All rise. This court is going to recess for one hour. What's going on here? This is all messed up. This is all messed up. Let's try to fix that. Oh, yeah. Okay. Okay. I want to do this. Do you want to do something else? I think so. Yeah. All right. All right. All right. All right. All right. All right. All right. That's what you're getting, Steve. Yeah. On the way out on the court. Yeah. Stop this.
judges: Reinhardt, Hawkins, Gould